[Cite as *State v. Hoseclaw*, 2013-Ohio-3486.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                 CASE NO. 1-12-31

    v.

CLINTON A. HOSECLAW,           O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2011 0415

Judgment Affirmed

Date of Decision: August 12, 2013

APPEARANCES:

    *Christopher T. Travis* **for Appellant**

    *Jana E. Emerick* **for Appellee**

**PRESTON, P.J.**

{¶1} Defendant-appellant, Clinton A. Hoseclaw, appeals the Allen County Court of Common Pleas' judgment entry of conviction and sentence. For the reasons that follow, we affirm.

{¶2} On December 15, 2011, the Allen County Grand Jury indicted Hoseclaw on Count One of unlawful sexual conduct with a minor in violation of R.C. 2907.04(A) & (B)(4), a second-degree felony, and Count Two of rape in violation of R.C. 2907.02(A)(2), a first-degree felony. (Doc. No. 3).

{¶3} On December 22, 2011, Hoseclaw was arraigned, entered pleas of not guilty, and was appointed trial counsel. (Doc. Nos. 9, 52).

{¶4} On January 9, 2012, Hoseclaw filed a motion to suppress statements he made to law enforcement. (Doc. No. 13). On February 7, 2012, the trial court held a hearing on the motion, and, on March 27, 2012, the trial court overruled the motion. (Doc. No. 44).

{¶5} On March 26-27, 2012, a jury trial was held wherein the jury found Hoseclaw guilty Count One of unlawful sexual conduct with a minor. (Doc. Nos. 45, 52). However, the jury could not reach a verdict on Count Two of rape, so the trial court declared a mistrial as to that count. (Doc. No. 52); (Mar. 26-27, 2012 Tr., Vol. II at 461-467).

{¶6} On June 25-26, 2012, a second jury trial was held on the rape charge, and the jury found Hoseclaw guilty. (Doc. Nos. 97, 104). At the conclusion of the trial, the trial court proceeded to sentencing. The trial court found that unlawful sexual conduct with a minor was a lesser-included offense of rape pursuant to *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314. (Doc. No. 104); (June 25-26, 2012 Tr. Vol. II at 485). Thereafter, the State elected to proceed to sentencing on the rape conviction, and the trial court sentenced Hoseclaw to eight years imprisonment. (*Id.*). (*Id.* at 485-493). The trial court filed its judgment entry of conviction and sentence on June 28, 2012. (Doc. No. 104).

{¶7} On July 23, 2012, Hoseclaw filed a notice of appeal. (Doc. No. 107). Hoseclaw raises three assignments of error for our review, all relating to the second trial on the rape charge.

### Assignment of Error No. I

**The trial court erred to the prejudice of appellant/defendant by entering a guilty finding upon a verdict that was against the manifest weight of the evidence.**

{¶8} In his first assignment of error, Hoseclaw argues that his rape conviction was against the manifest weight of the evidence. In particular, Hoseclaw argues that the victim was not credible, because she did not make any allegations against him until nearly nine months after the alleged incident. He also argues that the victim was not credible, because, after the alleged rape occurred,

she remained alone in his vehicle with access to her cell phone and yet she did not flee or call anyone for help. Finally, Hoseclaw argues that the victim was not credible because she threw away her clothing and took a shower destroying any potentially exculpatory physical evidence.

{¶9} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

{¶10} The criminal offense of rape is codified in R.C. 2907.02, which provides, in relevant part: "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2).

{¶11} The victim, K.S., testified that, at the time of the second trial, she was fourteen (14) years old, but she had just turned thirteen (13) years old prior to

the rape. (June 25-26, 2012 Tr. at 185-186). K.S. testified that, in October 2010, she was living with her brother, Anthony (10 years old), her sister, Elizabeth (14 years old), her mother, Antoinette, and her father. (*Id.*). K.S. also testified that she has a half-brother, Eric (19 years old), and a half-brother, Wayne, but they did not live with the family. (*Id.* at 186). Eric, according to K.S., was living two doors down from her parents with Mona and Paul, her parents' best friends, along with his girlfriend, Mona and Paul's daughter. (*Id.* at 186-187). K.S. testified that, back in October 2010, she had known Hoseclaw for approximately a month or so, and he was not a close friend but someone who would hang out with her half-brother, Eric, at Mona and Paul's house. (*Id.* at 187). K.S. testified that she spent time with Hoseclaw only as part of a group of five to six people, and she never went to Hoseclaw's house on Dewey Avenue, nor was she aware that he lived on Dewey Avenue. (*Id.* at 188). K.S. testified that, on October 28, 2010 after 4:30 p.m., she went home after volleyball practice, changed into some loose blue jean shorts, and went to Mona and Paul's house to visit their daughter and her friend, Isabella. (*Id.* at 188-189). K.S. testified that Hoseclaw was at the house, and Hoseclaw mentioned going to Subway for dinner, which she said sounded good. (*Id.* at 190). K.S. testified that she told her mom that Hoseclaw and Eric were going to get Subway, and she asked her mom if she could go with them to get everyone in the family Subway for dinner. (*Id.* at 190-191). K.S. testified that

her mom allowed her to go and gave the money to Hoseclaw, who went with her to ask permission. (*Id.* at 191). K.S. testified that her mother knew Hoseclaw through her brothers, and Hoseclaw would sometimes play X-box with her 11-year-old brother, A.J., and, one time, helped A.J. put together a science kit. (*Id.* at 191-192). K.S. testified that something came up and Eric could not go to Subway and to Speedway to get a pop for her mom. (*Id.* at 193). K.S. testified that they went to Speedway for a drink for her mom, rather than Subway, because her mom likes the foam cups Speedway has for their Pepsi drinks. (*Id.*). She testified that, when they left for Subway, it was just starting to turn dark outside. (*Id.* at 205).

{¶12} K.S. testified that Hoseclaw was driving and she was seated in the passenger seat. (*Id.* at 194). According to K.S., they drove out Leland Avenue, where they live, and turned left at Jamison Avenue, though she was not paying attention while Hoseclaw was driving since she was texting and listening to her music. (*Id.* at 194-195, 197-198). She testified that she was not paying attention after Hoseclaw turned left onto Jamison Avenue, and she figured that Hoseclaw was going to the Speedway on Cable Road rather than the Speedway on Jamison Ave. (*Id.* at 195). According to K.S., the next thing she heard was Hoseclaw say, "Oops, took a wrong turn," and when she glanced up, they were parked in an alley, and Hoseclaw was coming over onto her side of the seat. (*Id.* at 195-196). She testified that Hoseclaw came over on her side of the seat, knocking her cell

phone to the floor, and her right arm was pinned against the door and in between the seat. (*Id.* at 198-199). K.S. testified that Hoseclaw pinned her left hand up against the seat, and he was wearing stretchy shorts and a white t-shirt. (*Id.*). K.S. testified that Hoseclaw drives a white SUV, her seat was already all the way back, but she could not recall where the gearshift was located or whether there was a center console. (*Id.*); (*Id.* at 225). K.S. testified that Hoseclaw's body was on top of her chest, with all of his weight on her, and he was facing her. (*Id.* at 200). K.S. testified that Hoseclaw then pulled down her pants and underwear together with his left hand, put his knee in between her legs to separate them, and put his penis inside her vagina. (*Id.* at 200-201). K.S. testified that Hoseclaw managed to get her pants and underwear all the way down by pushing them down with his foot after placing his knee in between her legs. (*Id.* at 202). K.S. testified that, when Hoseclaw began to climb over on top of her, she was "in shock" and did not say anything but later told him to stop. (*Id.* at 203). She testified that she was "scared and didn't really know what to do. And [she] just wanted out of it." (*Id.*). When asked if she fought Hoseclaw off of her, K.S. testified, "I couldn't move. My body was pretty much pinned." (*Id.*). She testified that she could not see any houses from where they were parked, just brick buildings and graffiti. (*Id.* at 204). K.S. testified that she did not yell since she did not think anyone was around to hear her. (*Id.* at 205).

{¶13} K.S. testified that Hoseclaw put his penis in her vagina and went up and down for "probably like 10 minutes, 15 minutes." (*Id.* at 206). She testified that she did not see Hoseclaw take out his penis, but she felt it inside her, and it felt larger than a tampon and hurt. (*Id.*). K.S. testified that she did not know what this felt like prior to this incident. (*Id.*). K.S. testified that Hoseclaw kissed her on the cheek and was staring into her eyes, but she was looking toward the roof of the car just wanting it to end. (*Id.* at 207). According to K.S., after Hoseclaw finished he returned to his seat, and she laid there in shock not knowing what to do or if anyone would believe her. (*Id.*). After a few minutes passed, Hoseclaw told her to pull up her pants, which she did, though she continued crying. (*Id.* at 208). K.S. testified that Hoseclaw told her not to tell anyone or he would hurt her and her family. (*Id.*). After that, Hoseclaw drove to the Cable Road Speedway gas station, and, on the way there, she noticed that they were near her neighborhood but closer to St. Rita's Hospital. (*Id.* at 209). K.S. testified that she waited in the vehicle about five to ten minutes while Hoseclaw went into Speedway to get the pop. (*Id.* at 210). K.S. testified that Hoseclaw then drove to the Subway on Elida Road, and she again waited for him inside the vehicle, though she was not sure how long she waited. (*Id.* at 211). K.S. testified that she still had her cell phone with her, but she did not text or call anyone, nor did she leave the car and tell someone what happened, because she did not think anyone would believe her. (*Id.*

at 216-217). She testified that she did not think people would believe her because her friend down the street is "boy crazy" and is always talking about boys. (*Id.* at 217). She also testified that she did not tell her mom since she does not talk to her mom about boys or anything like that. (*Id.*).

{¶14} According to K.S., Hoseclaw then drove her home, she gave her mom the subs, her mom gave her a sub sandwich, and she went up to her bedroom and closed the door. (*Id.* at 211-213). K.S. testified that, as soon as she entered her bedroom, she just sat down against the bedroom door and cried for five to ten minutes. (*Id.* at 214). She testified that, when she changed her clothes, she noticed blood on her underwear. (*Id.* at 214-215). K.S. testified that it was more than spots of blood but also not like she had started her period, either. (*Id.* at 215). She testified that she threw her clothes away, took a shower, and did not tell anyone what happened. (*Id.*). K.S. testified that, in June 2011, she told her mom's best friend, Stephanie, about the rape after she had a bad dream about the rape at Stephanie's house. (*Id.* at 218-219). K.S. testified that Stephanie is like a second mom and confidant. (*Id.* at 219-220). K.S. testified that she did not want to tell her mom because she did not want to cause her mom, who suffers from Lupus, to be hospitalized because of the stress. (*Id.* at 213, 220). She testified that she thought Stephanie would keep her secret, but, after K.S. returned from summer camp, her mom asked her if Hoseclaw raped her. (*Id.* at 221-222). After K.S. told

her mom what happened, her mom called the police. (*Id.* at 222-223). K.S. testified that she underwent a gynecological exam and was tested for sexually transmitted diseases and for pregnancy, though both tests came back negative. (*Id.* at 223-224). K.S. identified Hoseclaw, the defendant, as the person who attacked her in the SUV on the night of October 28, 2010. (*Id.* at 224). K.S. denied asking Hoseclaw to have sex and testified that she never agreed to have sex with him. (*Id.* at 225). K.S. testified that Hoseclaw forced her to have vaginal intercourse with him. (*Id.*).

{¶15} On cross-examination, K.S. testified that it was approximately three or four minutes from the time she entered Hoseclaw's vehicle to the time Hoseclaw stated, "Oops, wrong turn." (*Id.* at 232). K.S. testified that, during the rape, her cell phone fell on the floor of the vehicle in front of her, and she did not pick her cell phone back up until she arrived home. (*Id.* at 235). She testified that she stayed in her bedroom the rest of the night after getting back home. (*Id.* at 236). She testified that she threw her clothes away in a trash can in her bedroom, and she eventually emptied out the can when it was garbage night, which was a Tuesday. (*Id.* at 237-238). K.S. explained that she did not think anyone would believe her since her best friend, Mona and Paul's daughter, lied about boys to K.S.'s mom. (*Id.* at 240). K.S. testified that, by the time they reached Subway it was "[a]lmost all the way dark." (*Id.* at 242). K.S. testified that she never told

anyone about the sexual encounter with Hoseclaw before talking to Stephanie. (*Id.* at 243-244). On re-direct, K.S. testified that she told Lima Police Officer Tiffany Najmowski about the details of the incident. (*Id.* at 245-246, 249-250). She further testified that it was normal for her to eat in her room and fall asleep afterwards since she would be tired from volleyball practice. (*Id.* at 247). According to K.S., her mother would not have been able to go up and down stairs to check on her due to her medical condition. (*Id.*). K.S. testified that her sister never said anything about the clothes being in the trash since they have thrown out clothes before. (*Id.* at 248). She also testified that, even if her bloody underwear were visible in the trash can, her sister would probably have just thought she started her period. (*Id.*). K.S. testified that she did not bleed through her pants and did not notice anything on the seat of Hoseclaw's SUV. (*Id.* at 249). K.S. could not recall if she told Najmowski that Hoseclaw threatened her if she told anyone. (*Id.* at 250).

{¶16} Stephanie Davenport testified that she has never met Hoseclaw, but she knows K.S. and became acquainted with her through K.S.'s father who worked at Domino's pizza with a friend of hers. (*Id.* at 253). Stephanie testified that she has been good friends with K.S.'s mother, Antoinette, for the last six years. (*Id.* at 254). Stephanie testified that she treated Antoinette's children as her own, and she spent holidays with the family and bought them presents, and

Antoinette's children would stay overnight at her house. (*Id.*). Stephanie testified that K.S. would often share things with her she might not share with her mother. (*Id.* at 255). Stephanie testified that she generally kept K.S.'s secrets, unless it was something that was harmful to K.S., and then she would give that information to K.S.'s parents. (*Id.* at 256). Stephanie testified that K.S. told her that Hoseclaw raped her last summer, and Stephanie told K.S. that she needed to tell her mother, and if K.S. did not tell her mother that she would. (*Id.* at 258-259, 264). Stephanie testified that she told K.S.'s mom about the rape after K.S. failed to tell her. (*Id.* at 259-262). Stephanie testified that, during the beginning of the 2010 school year, K.S.'s behavior changed dramatically—K.S. was no longer excited about school, did not want to join sports, became more defiant toward her parents, and closed up to her. (*Id.* at 264). On cross-examination, Stephanie testified that she noticed the changes in K.S. after the Allen County Fair, which was in August. (*Id.* at 265-266). Stephanie testified that she had a prior theft conviction over eight years ago. (*Id.* at 270). On re-direct, Stephanie testified that K.S. asked her not to tell her mom, but Stephanie told K.S. that she could not do that and gave K.S. two weeks to talk to her mom about it. (*Id.* at 271).

{¶17} Antoinette testified that she is the biological mother of K.S., who was born in September 1997, and K.S. was thirteen years old and in the seventh grade in October 2010. (*Id.* at 275-276). Antoinette testified that, in October

-12-

2010, her step-son, Eric, was living at a neighboring house with Mona and Paul Pongratz, her really good friends. (*Id.* at 276-277). Antoinette testified that, as of October 2010, she had only known Hoseclaw for about a month, and he was visiting with Eric at Mona and Paul's house since Hoseclaw attended college with Eric. (*Id.* at 278-279). Antoinette did not know where Hoseclaw lived, and she never granted K.S. permission to visit Hoseclaw's house. (*Id.* at 281). Antoinette testified that she recalled that it was a school night after K.S. had returned from volleyball practice when Hoseclaw and K.S. went to Subway. (*Id.* at 281-283). According to Antoinette, K.S. was at the Pongratz's house, and she came back to the house with Hoseclaw asking if she could get Subway for the family. (*Id.* at 283). She testified that she asked K.S. to get her a Pepsi from Speedway, rather than Subway, since she likes the foam cups Speedway provides for their fountain drinks. (*Id.* at 284). Antoinette testified that it was just starting to get dark outside when K.S. and Hoseclaw left, but it was completely dark by the time they returned since they were gone for a little over an hour. (*Id.* at 285). Antoinette testified that she asked K.S. what took her so long, and K.S. did not respond but simply handed her the subs and Pepsi and headed upstairs to her bedroom. (*Id.* at 286). Antoinette testified that K.S. did not come downstairs that entire evening, and Hoseclaw did not come over to their house after that night. (*Id.* at 286-287). She testified that she reported the rape to the police in July 2011 after Stephanie told

her that Hoseclaw raped K.S. and K.S. confirmed it was true after K.S. returned from Christian camp, which was the summer after the rape. (*Id.* at 287-289). Antoinette testified that K.S. did not provide details of the rape; rather, she asked K.S. if Hoseclaw touched her, and K.S. indicated "yes." (*Id.* at 290). On cross-examination, Antoinette testified that she thought Eric was going to go with K.S. and Hoseclaw to Subway. (*Id.* at 291-292). She testified that she was not sure whether Hoseclaw dropped K.S. off at her house or at the Pongratz's house. (*Id.* at 292). Antoinette testified that she believed K.S. (*Id.* at 294).

{¶18} Lima Police Detective Steven Stechschulte testified that, after Officer Tiffany Najmowski contacted him about the rape, he spoke with Hoseclaw on Friday, July 29, 2011, and Hoseclaw denied knowing K.S. (*Id.* at 295-297). After Stechschulte told Hoseclaw that he was aware of Hoseclaw's relationship with someone living a couple doors down from K.S., Hoseclaw admitted that he knew K.S.'s brother but said he did not know K.S. that well. (*Id.* at 298). Hoseclaw denied having sex with K.S. and did not have any response when Stechschulte asked about possible DNA evidence in Hoseclaw's vehicle. (*Id.*). Stechschulte testified that he then arrested Hoseclaw for suspicion of rape. (*Id.* at 299). Stechschulte testified that, on Monday, August 1, 2011, when Hoseclaw was brought to the Sheriff's Department for booking, a corrections officer informed him that several detainees wanted to speak with him regarding

statements made by Hoseclaw. (*Id.* at 300). The inmates informed Stechschulte that Hoseclaw should be removed from the holding cell before he was beat up for making statements about having consensual sex with a thirteen-year-old girl. (*Id.*). Stechschulte testified that this was the first time he heard about Hoseclaw and K.S. having consensual sex. (*Id.*). Stechschulte testified that he moved Hoseclaw to another, separate holding room, and he explained to Hoseclaw that he was moving him for his own protection due to the statements he made to the other detainees. (*Id.* at 301). Stechschulte testified that two days later, on August 3rd, Hoseclaw contacted him to discuss the sexual encounter with K.S. (*Id.* at 302). Stechschulte testified that, during the interview with Hoseclaw when he asked about the incident occurring in Hoseclaw's vehicle, Hoseclaw indicated that law enforcement would never find anything in his vehicle because he never had a chance to "properly christen" his vehicle—meaning Hoseclaw never had sex in his vehicle. (*Id.* at 304). Stechschulte identified State's exhibit one as a copy of portions of the August 3rd interview with Hoseclaw. (*Id.* at 305). Stechschulte testified that he omitted portions of the interview that were concerning an unrelated burglary that Hoseclaw alleged occurred at his home. (*Id.* at 306).

{¶19} Stechschulte testified that, at the time of the incident, Hoseclaw was living at 169 South Dewey Avenue in Lima, about a block away from Lima Memorial Hospital. (*Id.* at 308). Stechschulte testified that he located Hoseclaw's

vehicle, a 2002 white Chevy Blazer SUV, and removed the passenger-side bucket seat and sent the upholstery to BCI for testing. (*Id.* at 310-316, 334). Hoseclaw's vehicle was an automatic transmission with the gear shift located on the floor towards the front dash area, not in a console between the seats, according to Stechschulte. (*Id.* at 315). Stechschulte testified that he located some of Hoseclaw's personal items, including a photograph, in the glove box of the vehicle, so he called Hoseclaw and offered to return those items. (*Id.* at 316). Stechschulte testified that he delivered the items to Hoseclaw and informed him that he removed the seat of his vehicle for testing. (*Id.* at 318). Stechschulte identified State's exhibit two as a copy of the relevant portions of his second interview with Hoseclaw, which was on October 11th. (*Id.* at 320). Stechschulte testified that, during this interview, Hoseclaw changed some of the details of his story again, including the sequence of the events, and whether they went back to K.S.'s house first or straight to his house for consensual sex. (*Id.*). Stechschulte also testified that, during the October 11th interview, Hoseclaw stated that he had "christened" his vehicle, but just not with K.S. (*Id.* at 322). Stechschulte testified that Hoseclaw would have been about twenty-six years old when the rape occurred. (*Id.* at 324). Stechschulte testified that he tried to obtain the video surveillance tapes from Speedway and Subway, but those businesses do not keep video from that long ago. (*Id.* at 325). Stechschulte testified that the area where

K.S. described Hoseclaw driving was near St. Rita's hospital and that area has several secluded alleys and vacant residences. (*Id.* at 327-328).

**{¶20}** Lima Police Officer Gregory Adkins testified that he collects physical evidence at crime scenes for the police department. (*Id.* at 336-337). He testified that he helped Stechschulte remove the front passenger seat from Hoseclaw's vehicle and brought it back to the police department. (*Id.* at 337-338). Adkins testified that Stechschulte placed the seat in the property room at the police department until they had further instruction from The Bureau of Criminal Investigations ("BCI"). (*Id.* at 339). Adkins testified that BCI told them to send the upholstered part of the seat, not the entire seat, so he cut the upholstered part from the seat frame, which he identified as State's exhibit three. (*Id.* at 340). Adkins identified State's exhibit four as the seat cushion upholstery and State's exhibit three as the back rest upholstery. (*Id.* at 345-346). Adkins identified State's exhibit five as a buccal DNA swab he took from Hoseclaw. (*Id.* at 347-348).

**{¶21}** Peter James Tassi, Jr., a forensic biologist at BCI, testified that he located sperm cells on the back portion of the seat (State's exhibit three). (*Id.* at 354, 358, 364). He testified that further analysis was done at the lab to determine if the sperm cells matched the submitted DNA sample (Hoseclaw's DNA), but he did not perform that testing. (*Id.* at 365). On cross-examination, Tassi testified

that he located eight possible locations on the car seat upholstery for bodily fluid, but only one location reacted to the color-change test, which indicates the presence of semen. (*Id.* at 374, 378). Tassi identified State's exhibit eight as a copy of his report. (*Id.* at 357-358); (State's Ex. 8).

{¶22} Raymond Peoples, a forensic scientist in the DNA section of BCI, testified that he compared samples from three swabbings of the car seat, one of which was the semen stain identified by Tassi. (*Id.* at 380, 385-386). Peoples testified that he did not get any profile for the two blind swabs; however, he obtained a profile from the semen stain, and it was consistent with Hoseclaw's DNA. (*Id.* at 386). Peoples identified State's exhibit nine as a copy of his report. (*Id.* at 385); (State's Ex. 9).

{¶23} Thereafter, State's exhibits one through nine were admitted into the record without objection. (*Id.* at 397). The defense moved for acquittal pursuant to Crim.R. 29(A), which was denied. (*Id.* at 398-400). The defense then rested and renewed the motion for acquittal, which was again denied. (*Id.* at 400-401).

{¶24} Hoseclaw argues that the verdict was against the manifest weight of the evidence since the victim, K.S., was not credible, pointing to several uncontested facts. First, Hoseclaw argues that K.S. was not credible because she waited nearly nine months to tell anyone about the incident. While this is true, K.S. explained that she did not tell anyone because she did not think anyone would

believe her because her girlfriend, Mona and Paul's daughter, would lie about boys all the time. (*Id.* at 216-217). The jury was free to believe or disbelieve the victim's rationale for not reporting the rape. *State v. Abdussatar*, 8th Dist. Cuyahoga No. 86406, 2006-Ohio-803, ¶ 25 (jury was free to believe victim even though the victim did not report the rape for six months where the victim stated she was scared). We are not persuaded that this diminishes K.S.'s credibility.

{¶25} Next, Hoseclaw argues that K.S. was not credible because she claims that, immediately after the incident, she did not attempt to flee or call anyone even though she was alone in the vehicle with her cell phone. It is true that K.S. testified that she did not flee the vehicle or attempt to call anyone on her cell phone after the rape occurred; however, K.S. gave the same explanation for this behavior—she did not think anyone would believe her. Furthermore, K.S. testified that Hoseclaw threatened to harm her and her family if she told anyone what happened. (June 25-26, 2012 Tr. at 208). Besides the overwhelming shock that K.S. felt from the rape, Hoseclaw's threat may very well have kept her from telling anyone, at least immediately after the incident. The jury was entitled—and duty bound—to determine K.S.'s credibility in this matter. *State v. Curtis*, 8th Dist. Cuyahoga No. 48011, *2 (Nov. 15, 1984) (jury was free to believe the victim's testimony that she was afraid to escape from her attacker while he was in the shower). We are not convinced that this fact raises a sufficient issue with

K.S.'s credibility to find that the jury clearly lost its way and created a manifest injustice.

{¶26} Finally, Hoseclaw argues that K.S.'s credibility is questionable given that she discarded her clothing and took a shower thereby destroying important physical evidence. We are not persuaded by this argument, either. It is completely understandable that a rape victim would want to destroy or discard the clothing she was wearing during a rape—having that clothing around would serve as an unwanted reminder of what happened. It is not uncommon that rape cases lack physical evidence, and physical evidence is not required to prove the rape occurred; testimony of a victim is sufficient. *State v. Banks*, 71 Ohio App.3d 214, 220 (3d Dist.1991). Furthermore, it is not uncommon for victims of sexual assault to bathe or shower afterwards to cleanse themselves—literally and even psychologically—from the attack. K.S.'s behavior is not abnormal and is understandable behavior, which does not significantly impact her credibility.

{¶27} The jury had ample reasons to believe K.S. and disbelieve Hoseclaw. K.S. consistently maintained that Hoseclaw raped her in his vehicle. Hoseclaw's story, on the other hand, changed several times. When Hoseclaw was first asked about the rape allegation, he denied knowing K.S. altogether. (June 25-26, 2012 Tr. at 297-298). Then, when Stechschulte told Hoseclaw that he knew Hoseclaw knew Mona and Paul who lived near K.S. and her family, Hoseclaw admitted that

-20-

he knew K.S.'s brother, Eric, but did not know K.S. that well. (*Id.*). Thereafter, during his first interview with police and after Stechschulte confronted Hoseclaw with statements he made to other detainees about him having sex with a thirteen-year-old girl, Hoseclaw admitted he had consensual, vaginal sex with K.S. at his house on Dewey Street. (State's Ex. 1). Hoseclaw adamantly denied having sex in his vehicle with K.S. or anyone else, stating that he never had an opportunity to "properly christen" his vehicle. (State's Exs. 1-2); (June 25-26, 2012 Tr. at 303, 310). Instead, Hoseclaw claimed that K.S. grabbed his face and kissed him while they were driving from Speedway to Subway. (State's Ex. 1-2). Hoseclaw also alleged that K.S. asked him if he would have sex with her, because she has wanted him since she first met him. (*Id.*). Hoseclaw alleged that he first said "no" but later agreed, so they dropped off Subway at her house and went to his house and had sex. (*Id.*).

{¶28} Hoseclaw also stated that K.S. was with him before on multiple occasions, getting movies at his house, picking up Speedway, or picking up Eric. (State's Ex. 2). K.S. testified, however, that, as of October 2010, she had only known Hoseclaw for about a month, she never spent time with Hoseclaw except with a group of people, and she was never at his house. (June 25-26, 2012 Tr. at 187-188). Hoseclaw admitted taking K.S. to Subway, though he thought the date was not October 28th since he was busy that night. (State's Ex. 1-2). He also

alleged that, after they returned from Subway, he stayed at K.S.'s house for 15-20 minutes. (*Id.*). K.S.'s mother, on the other hand, testified that Hoseclaw did not come in the house after they returned with Subway. (June 25-26, 2012 Tr. at 286-287). Hoseclaw stated that after he left K.S.'s house, he went to Mona and Paul's house, and then to his friend Sean Robie's (phonetic) house in Elida. (State's Ex. 2). When Stechschulte asked which friend's house, presumably to check Hoseclaw's story, Hoseclaw stated that Sean had already moved back to Michigan, anyway. (*Id.*). Hoseclaw also alleged that K.S. was wearing stretchy pants the night they went to Subway, but K.S. testified that she was wearing blue jean shorts. (June 25-26, 2012 Tr. at 188-189).

{¶29} Based upon our review of the evidence, we are not persuaded that the jury clearly lost its way creating a manifest injustice. There was evidence upon which the jury could have reasonably concluded that Hoseclaw purposefully compelled K.S. to engage in sexual conduct by force. R.C. 2907.02(A)(2). While K.S.'s story remained consistent, Hoseclaw changed his story several times after Stechschulte presented him with reasons he thought Hoseclaw was not being truthful. Under these circumstances, the jury could have believed K.S. and disbelieved Hoseclaw, and we will not second-guess the jury's credibility determination.

{¶30} Hoseclaw's first assignment of error is, therefore, overruled.

**Assignment of Error No. II**

**Appellant was deprived of his right to effective assistance of counsel as provided pursuant to the 14th and 6th Amendments to the U.S. Constitution.**

{¶31} In his second assignment of error, Hoseclaw argues he was denied effective assistance of trial counsel when trial counsel failed to object to irrelevant, prejudicial, or otherwise inadmissible evidence that the State used to bolster the victim's credibility.

{¶32} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland*, 466 U.S. at 687. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Carter*, 72 Ohio St.3d 545, 558 (1995). Rather, the errors complained of must amount to a

substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St. 3d 136, 141-142 (1989), quoting *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976).

**{¶33}** Initially, we note that whether to object to the admission of testimony is generally a matter of trial strategy and not grounds for ineffective assistance. *State v. Schlosser*, 3d Dist. No. 14-10-30, 2011-Ohio-4183, ¶ 31. As the Court in *State v. Hartman* observed, "'[b]ecause objections tend to disrupt the flow of a trial, [and] are considered technical and bothersome by the fact-finder, * * * competent counsel may reasonably hesitate to object in the jury's presence.'" 93 Ohio St.3d 274, 296 (2001), quoting *State v. Campbell*, 69 Ohio St.3d 38, 53 (1994) (internal quotations omitted). With that in mind, we will address the specific instances where Hoseclaw argues that trial counsel should have objected.

**{¶34}** The first instance where Hoseclaw alleges that defense counsel was ineffective for failing to object to allegedly inadmissible hearsay was the following:

Q: Okay. Why didn't you tell your mom?

A: I really don't talk to her about boys or anything like that.

Q: Okay. Did you eventually tell somebody what happened to you, [K.S.]?

A: Yes, I did. (June 25-26, 2012 Tr. at 217-218).

{¶35} The second instance where Hoseclaw alleges that defense counsel was ineffective for failing to object to allegedly inadmissible hearsay was the following, referring to a conversation K.S. had with her mother about the rape:

Q: Okay. And give the exact words that * * * [your mother] used with you to ask you about it?

A: She -- as soon [sic] I walked in the door, she's like -- after I sat down she asked me, "Did [Hoseclaw] rape you?"

Q: Okay. And what did you tell her.

A: I told her yes. (*Id.* at 222).

{¶36} The third instance where Hoseclaw alleges that defense counsel was ineffective for failing to object to allegedly inadmissible hearsay was the following, referring to a conversation K.S. had with the law enforcement officer that responded to the reported rape:

Q: Did you tell him what happened?

A: Yes. (*Id.* at 223).

{¶37} The fourth instance where Hoseclaw alleges that defense counsel was ineffective for failing to object to allegedly inadmissible hearsay was the following, referring to a conversation K.S. had with another law enforcement officer:

Q: Okay. But the primary person you were talking to would have been Officer Tiffany?

A: Yes.

* * *

Q: Okay. And did you go through all these details with her?

A: Yes. (*Id.* at 246).

{¶38} Hoseclaw's arguments are meritless. To begin with, the fourth instance is cross-examination conducted by his trial counsel. Trial counsel was not ineffective for questioning the victim concerning whether or not she shared the details of the offense to the reporting officer. This was clearly a trial strategy to question her credibility, especially in light of the fact that she took over nine months to come forward.

{¶39} The first and third instances do not involve hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). The testimony here does not concern the statements K.S. made, only whether she made any statements. Finally, the second instance is not hearsay because it was not offered for the truth of the matter asserted—that Hoseclaw, in fact, raped K.S.—but rather, for the fact that K.S. told her mother that Hoseclaw raped her. Even if this testimony was inadmissible hearsay, trial counsel was not

ineffective for failing to object to it since defense counsel's trial strategy was premised on the lack of evidence of force or threat of force and, more importantly, the victim's lack of credibility. (*Id.* at 182-183, 434-436). The testimony elicited by the State was relevant because it explained why the victim did not initially report the rape and how the rape was ultimately reported to law enforcement.

{¶40} Next, Hoseclaw argues that trial counsel was ineffective for failing to object to irrelevant and prejudicial evidence of the victim's lack of sexual history. The line of questioning was as follows:

Q: Okay. Again, as graphic as this may seem, how do you know his penis was inside your vagina, [K.S.]?

A: Because I can feel it.

Q: Okay. Did you know what that felt like prior to this time?

A: No. (*Id.* at 206).

Hoseclaw argues that trial counsel was ineffective for failing to object to this irrelevant and inadmissible testimony concerning the victim's past sexual experiences. This argument lacks merit. The context of the testimony reveals that the State was seeking to establish penetration, which is required to show sexual conduct, an essential element of rape. R.C. 2907.02(A)(1), 2907.01(A). Furthermore, this was not "evidence of specific instances of the victim's sexual activity" prohibited under R.C. 2907.02(D); rather, the testimony related to the

victim's perception of whether Hoseclaw penetrated. Trial counsel was not ineffective for failing to object to this testimony.

**{¶41}** Finally, Hoseclaw argues that trial counsel was ineffective for failing to object to testimony concerning the emotional impact the rape had upon the victim. The testimony at issue is the following:

Q: Okay. Was there anything that you noticed during that school year of 2010 when [K.S.] was in 7th grade, any changes in her behavior?

A: A lot. She really got to the point where she didn't -- she wasn't as excited about school. She didn't want to join the sports like she had the year before. She didn't want to do anything. She became more defiant toward her parents and toward people. She got closed up with me to where she wouldn't really come out and talk to me as much or just her whole attitude had changed. She was not the [K.S.] that I knew. (June 25-26, 2012 Tr. at 264).

**{¶42}** Hoseclaw cites *State v. Presley*, 10th Dist. Franklin No. 02AP-1354, 2003-Ohio-6069, in support of his argument that this testimony was overly prejudicial and inflammatory. The victim in *Presley* testified that she had nightmares and both she and her mother tried to commit suicide as a result of the rape. *Id.* at ¶ 86. The testimony in this case is much less inflammatory than the

testimony in *Presley*, and the testimony in this case was not from the victim but from a third-party. Additionally, trial counsel cross-examined the witness regarding this testimony to identify a timeframe for these observations, and the witness testified that she noticed K.S.'s attitude change around the time of the Allen County Fair, which was at the end of August a couple months *prior* to the rape. (June 25-26, 2012 Tr. at 265-266). At that point, a reasonable juror might have concluded that the victim's change in attitude had nothing to do with the rape; but rather, was related to her age (a teenage girl) and the fact that the school year was going to begin again. In light of the nature of the testimony and counsel's cross-examination, we are not persuaded that trial counsel was ineffective for failing to object to this testimony.

{¶43} Hoseclaw's second assignment of error is overruled.

### Assignment of Error No. III

**The trial court erred to the prejudice of the appellant/defendant by admitting irrelevant hearsay evidence of prior consistent statements of an alleged victim.**

{¶44} In his third assignment of error, Hoseclaw argues that the trial court abused its discretion by admitting additional hearsay evidence. He argues that even if the evidence was not hearsay it was nevertheless inadmissible under Evid.R. 403.

**{¶45}** "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is inadmissible absent an applicable exception. Evid.R. 802. All relevant evidence is generally admissible; however, relevant evidence "may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." Evid.R. 402, 403(B).

**{¶46}** A trial court's decision whether to admit demonstrative evidence is reviewed for an abuse of discretion. *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, ¶ 82. An abuse of discretion is more than an error of judgment; rather, it implies that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

**{¶47}** Hoseclaw argues that the following testimony was inadmissible hearsay, which the trial court should have excluded:

Q: * * * Stephanie, I'd like to direct your attention specifically to last summer * * *[a]nd ask if [K.S.] made a revelation to you that was somewhat startling and out of the ordinary?

A: Yes. She was at my house spending the night so was the other kids, the other two (2) * * * her and her sister and brother had came to my house to spend the night. We took a trip to Wal-Mart. A

friend of mine, Rita, went with us. Rita had went into Wal-Mart to pick some things up that she needed for the house. That is when [K.S.] and me were sitting in my van and she proceeded to kind of mumble words to me. I didn't try to push her. I figured when she was ready to talk she would talk. She then proceeded to tell me --

[DEFENSE COUNSEL]: Objection. Hearsay.

[PROSECUTOR]: Your honor, we are not offering it for it's [sic] truth.

THE COURT: It's --

[PROSECUTOR]: We're offering it --

THE COURT: It's not being offered for the truth of the matter --

[PROSECUTOR]: for the circumstances of how the --

THE COURT: It's by --

[PROSECUTOR]: -- the revelation was made.

THE COURT: -- being offered for the fact that she said it, if she said it.

[DEFENSE COUNSEL]: And that's the question that should be asked, not what she said. She's not -- she does not get to repeat word for word the hearsay.

[PROSECUTOR]: Your honor, first of all, I'm asking about a statement made by [K.S.]. She's not an out of court declarant. She already testified. So by definition [sic] is not hearsay under the evidence rules.[1]

THE COURT: Overruled. You may testify.

A: (BY THE WITNESS) she proceeded to tell me that she was raped. And as far as getting into any other detail like that with her, I did not. I did, however, ask her that she needed to speak with her mother on the circumstances of what went on. And that I knew she would be leaving for a camp or whatever and that if she didn't let her mother know so that the proper steps could be tooken [sic] that I would in turn let her mother know what she had just confided in me about.

* * *

Q: When she reported this to you did she, in fact, though characterize it as a rape versus a consensual sexual encounter?

A: Yes. (June 25-26, 2012 Tr. at 256-259).

**{¶48}** The trial court did not abuse its discretion by allowing the witness to testify concerning the victim's statement that she was raped since it was offered

---

[1] We recognize that the prosecutor incorrectly characterized the subject statement as non-hearsay due to the fact that the declarant was testifying in court. However, that incorrect statement of law by the prosecutor is immaterial to our ruling on this particular argument.

not for its truth but to show why the witness reported the rape to the victim's mother, which the mother, then, reported to law enforcement. *See State v. Thomas*, 61 Ohio St.2d 223, 232 (1980) (statements made by an out-of-court declarant are properly admissible to explain the actions of a witness to whom the statement was directed). Therefore, the testimony was not inadmissible hearsay when offered for that purpose. Furthermore, Hoseclaw offers no reason why the testimony should have been excluded under Evid.R. 403(B), and we find no reason either. As such, we must conclude that the trial court did not abuse its discretion here.

{¶49} Hoseclaw's third assignment of error is, therefore, overruled.

{¶50} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and ROGERS, J.J., concur.**

**/jlr**

Case No. 1-12-31