[Cite as *State v. Saltz*, 2015-Ohio-3097.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                  CASE NO. 5-14-33

    v.

JOHN D. SALTZ,                      O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Hancock County Common Pleas Court
Trial Court No. 2013-CR-164

**Judgment Affirmed**

Date of Decision:  August 3, 2015

APPEARANCES:

    *Scott B. Johnson* **for Appellant**

    *Alex K. Treece* **for Appellee**

Case No. 5-14-33

**ROGERS, P.J.**

{¶1} Defendant-Appellant, John Saltz, appeals the judgment of the Court of Common Pleas of Hancock County denying his motion to suppress certain hearsay statements, convicting him of rape, and sentencing him to 15 years to life in prison. On appeal, Saltz argues that (1) the trial court erred by allowing the admission of certain hearsay statements; (2) his constitutional right to confront his accuser was violated; (3) the jury's verdict was not supported by sufficient evidence; and (4) the jury's verdict was against the manifest weight of the evidence. Based on the following, we affirm the judgment of the trial court.

{¶2} On August 6, 2013, the Hancock County Grand Jury returned a two count indictment against Saltz charging him with two counts of rape with a specification in violation of R.C. 2907.02(A)(1)(b) & 2907.02(B), felonies of the first degree. On August 22, 2013, Saltz pled not guilty by reason of insanity. The trial court found him competent to stand trial on March 20, 2014.

{¶3} On August 11, 2014, Saltz filed a motion to suppress[1] statements made by the alleged victim, K.S., arguing that any statements would constitute hearsay and would also violate his constitutional right to confront his accuser. The State filed its response on September 8, 2014. Saltz filed a supplemental brief on September 9, 2014. After a hearing, the trial court ultimately denied Saltz's motion on September 19, 2014. Specifically, the trial court found that K.S.'s

[1] Saltz's motion was filed as a motion in limine, however it should have been filed as a motion to suppress as the trial court stated.

-2-

statements were not testimonial, and therefore, Saltz's constitutional rights to confront his accuser were not violated. It also found that K.S.'s statements fell under the hearsay exception in Evid.R. 807 and were admissible.

**{¶4}** The State filed a motion to dismiss Count two of the indictment on September 29, 2014. The trial court granted the State's motion on the same day.

**{¶5}** The matter proceeded to trial on September 29, 2014 and lasted three days. Leann Saltz ("Leann") was the first witness to testify. Leann testified that she was previously married to Saltz from 1996 until their divorce in 2012. Leann had one child from a previous relationship, Kasandra S., f.k.a. Kasandra Thomas ("Kasandra"). She stated that Kasandra and her husband, Dustin S. ("Dustin"), have two children together, K.S. and M.S. Leann testified that K.S. was born in 2006. The jury was shown pictures of K.S., which were taken sometime in 2011 or 2012, and later admitted into evidence. Leann stated that K.S. would have been four years old on July 9, 2011.

**{¶6}** Leann testified that during their marriage, she and Saltz lived in a two bedroom house on Wilson Street in Findlay. As Leann was asked to describe the house, the following exchange took place,

> [Leann]: Okay. In the front you have the front door and an attached garage. Come in the front door to the living room. Directly behind the living room is a bathroom. Directly behind that bathroom is a bedroom. Across from that is the second bedroom. Then the kitchen and then the door to the attached garage.
>
> Q: Any outside rooms of your home?

A:     There's a patio enclosure on the back of the home.

* * *

Q:     Now you talked about this back patio enclosure.  How do you get to that back patio enclosure?

A:     There are two entrances.  One from the one bedroom and one from the outside.

* * *

Q:     I'm going to hand you a picture.  Do you recognize what's that depicting?

A:     That is a picture of the back patio enclosure.

Q:     That's the back patio that you discussed?

A:     Yes.

* * *

Q:     Okay.  Now, there's - - what's in front of that back window, that enclosure?

* * *

A:     Pine bushes.

* * *

Q:     They look * * * kind of unkempt?

A:     They are.

* * *

> [Leann]: Yes. I kept them that high for privacy reasons. I know we kept it at least to the bottom of the window. So that we could be in there and it was still private.
>
> Q: What did you use that room for?
>
> A: Before the flood it was like a living area. We had - - used it like a summer porch. We had a sofa and a couch and table and chairs and different stuff out there. After the flood it basically became storage.
>
> * * *
>
> Q: You indicated you used that basically for storage. What kind of items did you keep in there?
>
> A: We had an old sofa in there. The kid's [sic] bikes, toys, outside stuff that we would bring out in the summer and store in the winter. Toys, old computer out there.

Trial Tr. p. 293-296, 298. She also listed off several other items that were stored in the patio enclosure: a "Pack and Play," a Christmas wrapping paper storage box, lawnmower, and an outside playhouse. Photographs of the patio enclosure were shown to the jury and admitted into evidence.

{¶7} Leann explained that there were only two ways of accessing the patio enclosure. The first was through a door located in one of the two bedrooms. The other was a door located outside. Leann testified that because her grandchildren were so young, she blocked the bedroom entrance with an armoire so they would not be able to access the patio.

{¶8} Leann testified that she would spend lots of time with her granddaughters. She stated that they would go swimming, played, hung out, had

sleep overs, etc. She also testified that Saltz would participate in these events with the children. However, Leann explained that only she would bathe the children and help the children in the bathroom.

{¶9} Leann testified that K.S. and M.S. spent the night of July 8, 2011 at her house. She explained that when the girls slept over she would bring out an air mattress for the girls to sleep on in the family room. Leann, then, would sleep on the couch to be there in case the girls needed her for anything.

{¶10} Leann stated that when she awoke on July 9, 2011, she saw M.S. on the air mattress, but not K.S. She testified that she went around the house calling out for K.S. and Saltz, but was unable to find either one. She then went outside and observed Saltz, followed by K.S., walk out of the patio enclosure. She testified that she thought nothing of it at first. Leann stated that K.S. was dressed in a nightgown with underwear while Saltz was wearing only a pair of black gym shorts. According to Leann, Saltz went straight into the garage without saying a word, while K.S. sat down next to Leann on a lawn chair.

{¶11} While the two were sitting, Leann testified that she asked K.S. what she was doing. Before she could testify as to what K.S. said, Saltz objected to the testimony, which was overruled by the trial court pursuant to its previous ruling regarding Evid.R. 807. Leann stated that K.S. told her that K.S. could not tell her because it was a secret between K.S. and Saltz. Leann testified that she told K.S.

that K.S. should not keep secrets from her as the two should tell each other everything. Then the following exchange occurred.

Q:    And after you let her know that she could tell you anything, what did she say?

A:    She told me that [Saltz] showed her his pee pee and he looked at hers.

* * *

[Leann]:    I asked her what else had happened, and she said that he also kissed her pee pee. And she said that [Saltz] has big lips.

* * *

Q:    After she told you that [Saltz] kissed her and he had big lips, did you ask when or where this had happened?

A:    Yes, she said it happened that morning in the back porch. She got up to go potty and [Saltz] was up. So they went outside.

* * *

Q:    Okay. She tell you where in the back patio?

A:    On the steps.

Q:    When you say on the steps, the steps we saw on those photos are the ones [sic] lead into the back bedroom?

A:    Yes.

Q:    That armoire was there that stopped the girls from opening the door? So big that a person couldn't look into that room as well?

A:    Yes.

Q:    Did she go back to those back steps and show you?

A:     Yes.

*Id.* at p. 316-318.

{¶12} After K.S. finished telling Leann what happened, Leann testified that she told the girls to go inside and watch cartoons in the living room.  She stated that she approached Saltz and told him to get out of the house or she would "blow his brains out."  *Id.* at p. 319.  She explained that he initially asked why, but then agreed to leave if he could get a shower first.  After asking Saltz to leave, Leann testified that she called Kasandra and told her to come to the house right away.

{¶13} Leann stated Saltz returned approximately two weeks later to retrieve the rest of his belongings.  According to Leann, the two talked about a lot of things including the children.  Leann testified, "He told me he understood that I had to do what was best for the girls.  And he knew I was just doing what I thought was right."  *Id.* at p. 322.  She also stated that Saltz did not dispute the divorce and even paid his share of the attorney's fees without putting up a fight.

{¶14} On cross-examination, Leann admitted that her marriage to Saltz had been troubled from the start.  Leann explained that Saltz was unfaithful and had a hard time keeping a steady job, which frustrated her.  She also testified that the two of them had gone through marriage counseling.

{¶15} Kasandra was the next witness to testify on behalf of the State.  Kasandra testified that in 2011 her children called their private areas their "pee pee" and their "butt."  She stated that she and Dustin were traveling to a friend's

house on July 9, 2011, when she received a phone call from Leann telling her that she needed to come to the house right away. Kasandra testified that she had no idea what was going on because Leann would not tell her over the phone.

{¶16} When they arrived at Leann's house, Kasandra explained that Leann took her and K.S. into a bedroom and instructed K.S. to tell her what K.S. had told Leann. Then the following exchange occurred.

> [Kasandra]: She said that her [sic] and [Saltz] had a secret. That he had touched her pee pee. And that she wanted to tell me.
>
> Q: She said [Saltz] had touched her pee pee?
>
> A: Uh-huh. Well touched and kissed it.

*Id.* at p. 351. After learning this, she and Dustin discussed about what to do next.[2] They decided to take both girls to Blanchard Valley Hospital to make sure that both children were medically fine. Kasandra testified that hospital staff explained that they did not have the appropriate nurse on staff to handle reports of child rape. Moreover, they informed Kasandra and Dustin that they had called the police and that Kasandra and Dustin would have to talk to the officer upon his arrival. She stated that both she and Dustin, individually, talked with the police officer. After talking with the officer, the family traveled to Toledo Children's Hospital where they were transferred.

---

[2] At this point, Dustin had also learned of the abuse from K.S.

{¶17} Kasandra testified that they had not changed K.S.'s clothes that day, including her underwear. She stated that she was present when the Sexual Assault Nurse Examiner ("SANE") performed the rape kit. During the process, the SANE removed K.S.'s underwear and gave her new underwear to wear.

{¶18} Dustin was the next witness to testify. Dustin testified that on July 9, 2011, he went to Leann's house with Kasandra after Leann had called them. He stated that he did not accompany Kasandra, Leann, and K.S. into the bedroom. He added that after they came out of the bedroom he could tell something was wrong, but neither Kasandra nor Leann told him. He explained that he pulled K.S. to the side and asked her what she had told Leann. Dustin testified that K.S. told her that Saltz had touched her pee pee. He added, "I asked her how and she said with her finger, and then she stuck her tongue out. * * * Stuck her tongue out and pointed at her tongue." *Id.* at p. 383. Dustin also stated that he was not biologically related to Saltz.

{¶19} Brianna Westrick-Hiegel ("Westrick") was the next witness to testify on behalf of the State. Westrick testified that she was employed by Hancock County Job and Family Services and worked in the Children Services department back in July of 2011. She described her job as that of an investigator. She testified that she investigated the allegations in this case. Westrick stated that she and Detective Matt Tuttle of the Findlay Police Department were tasked with interviewing K.S. The two conducted the interview on July 18, 2011, at the

Center for Safe and Healthy Children in Findlay. Westrick testified that K.S. was interviewed individually and the only people in the room were Westrick, K.S., and Detective Tuttle. At the conclusion of her investigation, she testified that she labeled the abuse as indicated.

{¶20} Detective Tuttle was the next witness to testify. Detective Tuttle described what was in the rape kit that was used in this case.

> Again, lots of swabs for vaginal, anal, extra ones, like I said, depending upon where on the body they want to use them. They always have a pair of gloves because the SANE nurse will be wearing gloves. Samples where they can put their hair. DNA standards. Little bit of everything. Like I said, a lot of times we get this, but we'll get a bag or two, whether it's clothing, other items, that they'll return to us.

*Id.* at p. 430. He testified that the contents of the rape kit were sent to the Bureau of Criminal Identification and Investigation ("BCI") in Bowling Green. Detective Tuttle added that some of the contents were then sent to the Laboratory Corporation of American Holdings ("Lab Corp") in North Carolina for DNA testing.

{¶21} After Detective Tuttle received the results of the DNA tests, he stated that he interviewed Saltz regarding the findings. He testified, "[Saltz] denied with [sic] the results. He basically didn't answer it. When I confronted him about why your DNA would be in the girl's vaginal swab, and why your DNA would be in the girl's underwear there was no response at that point. I had like probably a ten second pause or so." *Id.* at p. 435-436. Detective Tuttle stated that Saltz informed

-11-

him that the children were truthful and "would not make up a lie this big." *Id.* at p. 437.

{¶22} Emily Miller was the next witness to testify. Miller testified that she works at BCI as a lab technician. Specifically, Miller analyzes pieces of evidence for body fluids and identifies them. She explained that after she analyzes the fluids she writes a report and forwards all the information and samples for DNA analysis. Miller stated that when she is assigned to a case, the first thing she does is read the allegations to get a better understanding of what type of fluids she is looking for and where it would be located on the samples that were provided. She explained that if she were looking for semen on a pair of pants she would go into a dark room and look for the semen to fluoresce under certain lights. She then would circle the areas that fluoresce and begin her testing, which is a simple color change test.

{¶23} In regard to this case, Miller testified that the allegations alleged the existence of amylase as the bodily fluid. She explained that amylase is a component of several different bodily fluids, including breast milk, urine, and feces, but it is most concentrated in saliva. Miller added that the testing process for amylase is different than the procedure done when looking for semen.

> Amylase - - Saliva not [sic] usually tend to fluoresce underneath bright light. So amylase, we go ahead and - - say on a pair of underwear. We look at the underwear. If the allegations were he fingered me or there was an oral assault, I go ahead I cut the sides of the underwear. I lay it flat. I take a specialized piece of paper. I put

the paper on the underwear. Hold it down flat. And then I perform - - I put my reagents on it. And then depending upon how the test reacts I know if there's amylase reaction or not. It's a presumptive test. It does not confirm saliva, but it's just indicative that saliva is there.

*Id.* at p. 460.

**{¶24}** Miller testified that she removed the contents of the rape kit in her lab and tested the samples for both semen and amylase. Photographs depicting the contents of the kit were shown to the jury and admitted into evidence. All the samples came back negative for semen, but the underwear tested positive for amylase. Specifically, she explained that her reagents changed the color of the paper, which presumes the presence of amylase. She added that after she performed her tests, she packed up the samples and forwarded them for DNA testing.

**{¶25}** Shawn Weiss was the last witness to testify. Weiss testified that he is employed by Lab Corp and is currently serving as a project manager. He explained that in 2011 he was employed as an associated technical director with Lab Corp. As a director, Weiss explained that he interpreted results of DNA tests, analyzed data, and wrote reports. He also testified, in detail, describing what DNA is and the process by which he is able to take samples from known persons to see if they match samples gathered at crime scenes or other areas of interest.

**{¶26}** Weiss stated that he tested the samples sent to the lab by Miller. The first sample was a vaginal swab taken from K.S. Weiss testified that he was able

to identify male DNA on the swab that was consistent with Saltz's DNA or someone that is a paternal relative of Saltz. Weiss stated that the DNA present had a frequency of .117240 or approximately 1 in every 9 males. The second sample was taken from K.S.'s underwear she was wearing during the alleged rape. Weiss stated that he was able to identify male DNA that was again consistent with Saltz or a paternal relative of Saltz. Weiss testified that the DNA present has a frequency of .000352 or approximately 1 in every 2841 male individuals.

{¶27} At the conclusion of Weiss' testimony, the State rested. Saltz moved for acquittal pursuant to Crim.R. 29, which was denied by the trial court. Saltz chose not to present any evidence and rested.

{¶28} After deliberating, the jury found Saltz guilty of rape. A sentencing hearing was held on November 12, 2014. The trial court sentenced Saltz to life in prison with the possibility of parole after 15 years, which was journalized in an entry filed on November 19, 2014.

{¶29} Saltz filed this timely appeal, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT ERRED IN ALLOWING THE ADMISSION OF CERTAIN OUT OF COURT STATEMENTS PURSUANT TO EVIDENCE RULE 807 AND CONTRAVENED DEFENDANT'S CONSTITUTIONAL RIGHT TO CONFRONT HIS ACCUSER.**

*Assignment of Error No. II*

**THE DEFENDANT'S CONVICTION WAS NEITHER SUPPORTED BY THE SUFFICIENCY NOR THE MANIFEST WEIGHT OF THE EVIDENCE.**

*Assignment  of Error No. I*

{¶30} In his first assignment of error, Saltz argues that the trial court erred by allowing certain hearsay statements into evidence.  Specifically, he argues that the statements made by K.S. to her parents and grandmother were not trustworthy, and therefore the exception in Evid. R. 807 did not apply.  Additionally, he argues that his constitutional right to confront his accuser was violated.  We disagree.

{¶31} Initially, we note that Saltz has combined two separate arguments into one assignment of error.  Loc.R. 11(A) states that "[e]ach assignment of error must be separately argued in the briefs unless the same argument, and no other, pertains to more than one assignment of error."  While this sort of argument is against our local rules, in the interest of justice, we elect to address Saltz's arguments.

*Evid.R. 807*

{¶32} An appellant has a duty to ensure that the record necessary to evaluate the assignment of error is filed with the appellate court.  *State v. Williams*, 73 Ohio St.3d 153, 160-161 (1995); App.R. 9(B).  Where an appellant fails to include a necessary portion of the record, we must presume regularity in

the trial court's proceedings. *State v. West*, 3d Dist. Auglaize No. 2-06-04, 2006-Ohio-5834, ¶ 53.

{**¶33**} On appeal, Saltz argues that the State has failed to prove how Evid.R. 807 applies to the statements made by K.S. to her parents and grandmother. Specifically, he attacks the trustworthiness of K.S.'s statements as well as the fact that K.S. was available to testify. *See* Evid.R. 807(A)(1)-(2). According to the docket in this case, a hearing was held on Saltz's motion to suppress on August 29, 2014. *See* (Docket No. 69, p. 3). However, Saltz did not provide this court with a transcript of this hearing. In the absence of a transcript, we must presume that testimony was presented that showed the trustworthiness of K.S.'s statements and the fact that she lacked memory of the alleged rape.

{**¶34**} As to his Confrontation Clause argument, Saltz argues that the statements made by K.S. were testimonial. This motion was also heard at the August 29, 2014 hearing. Without a transcript, we must presume regularity that the trial court followed all procedures. Nonetheless, given the United States Supreme Court's recent opinion, it is quite clear that K.S.'s statements would not have been testimonial. In *Ohio v. Clark*, ___ U.S. ___, 2015 WL 2473372 (June 18, 2015), the Court found that a three-year-old's statements to his teacher about physical abuse did not violate the Confrontation Clause. *Id.* at *6. Specifically, the Court noted that "[s]tatements by very young children will rarely, if ever, implicate the Confrontation Clause. Few preschool students understand the details

of our criminal justice system." *Id.* at *7. The Court continued, "Thus, it is extremely unlikely that a 3-year-old child in [the victim's] position would intend his statements to be a substitute for trial testimony. On the contrary, a young child in these circumstances would simply want the abuse to end, would want to protect other victims, or would have no discernable purpose at all." *Id.*

{¶35} Accordingly, Saltz's first assignment of error is overruled.

*Assignment of Error No. II*

{¶36} In his second assignment of error, Saltz argues that the jury's verdict is neither supported by the sufficiency nor the manifest weight of the evidence. Specifically, he argues that the State failed to prove that he had sexual contact with K.S.[3] and that it was for the purpose of sexually arousing or gratifying either person. We disagree.

{¶37} Again, we note that Saltz has combined two arguments into one assignment of error. Loc.R. 11. Although Saltz has argued both sufficiency and manifest weight as one argument, they are in fact two separate legal theories, each with their own standard of review. Therefore, we will address the two separately.

*Sufficiency of the Evidence*

{¶38} When an appellate court reviews the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most favorable

---

[3] In his brief, Saltz initially refers to the victim as M.S. However, M.S. is not the victim in this case. It seems clear from his brief that this was a simple typographical error as he refers to K.S. as the victim for the rest of his arguments.

to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47. Sufficiency is a test of adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, the question of whether the offered evidence is sufficient to sustain a verdict is a question of law. *State v. Wingate*, 9th Dist. Summit No. 26433, 2013-Ohio-2079, ¶ 4.

{¶39} If a person engages in sexual conduct with another, who is not the spouse of the person, and the other person is less than thirteen years of age, then that person is guilty of rape. R.C. 2907.02(A)(1)(b). Sexual conduct is defined as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex * * *." R.C. 2907.01(A). The allegations and evidence presented at trial suggest that Saltz performed cunnilingus on K.S. "The statute does not define cunnilingus. However, this court has defined cunnilingus as 'a sexual act committed with the mouth and the female sexual organ.'" *State v. Bower*, 3d Dist. Shelby No. 17-14-14, 2015-Ohio-1889, ¶ 8, quoting *State v. Ramirez*, 98 Ohio App.3d 388, 393 (3d Dist.1994), citing *State v. Bailey*, 78 Ohio App.3d 394, 395 (1st Dist.1992).

{¶40} Here, Saltz argues that the State failed to present evidence to support a finding that he engaged in sexual *contact* with K.S. for the purpose of sexual

-18-

arousal. This, however, is not an element of rape. Sexual contact is an element of crimes such as gross sexual imposition. Rape, rather, requires sexual *conduct*. Whereas sexual contact requires that the contact be done for the purpose of sexual arousal, sexual conduct does not include this second requirement.

{¶41} Further, there are several elements that are not in dispute on appeal. In his brief, Saltz concedes that K.S. was not Saltz's spouse at the time of the alleged rape and that she was under the age of 13 at the time of the alleged rape. Further, he concedes that if the allegations are true, then it happened in Hancock County in Ohio. Thus, the only remaining issue is whether the State presented enough evidence for any rational trier of fact to have found that Saltz engaged in sexual conduct, i.e. performed cunnilingus, with K.S.

{¶42} At trial, Leann, Kasandra, and Dustin all testified that K.S. told them that Saltz touched her pee pee. They also stated that K.S. told them that Saltz had kissed her pee pee and that he had big lips. Kasandra and Dustin testified that given K.S.'s age she calls her vagina her pee pee. Detective Tuttle stated that Saltz told him that K.S. is very truthful and would not lie about something this big. Moreover, the State presented the testimony of Miller. She testified that she detected amylase on both the vaginal swab and underwear that was obtained by the SANE nurse from K.S. She also stated that amylase is most concentrated in saliva. Weiss next testified that he analyzed the samples Miller had forwarded to the lab and found DNA consistent with that of Saltz's.

{¶43} After viewing the evidence in the light most favorable to the State, we find that any rational trier of fact could have found that the essential elements of rape were proven beyond a reasonable doubt.

*Manifest Weight of the Evidence*

{¶44} When an appellate court analyzes a conviction under the manifest weight standard, it "sits as the thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 83 (1997). Accordingly, it must review the entire record, weigh all of the evidence and its reasonable inferences, consider the credibility of the witnesses, and determine whether the fact finder "clearly lost its way" in resolving evidentiary conflicts and "created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). When applying the manifest weight standard, a reviewing court should only reverse a trial court's judgment "in exceptional case[s]" when the evidence "weighs heavily against the conviction." *Id*. at paragraph three of the syllabus.

{¶45} Having disposed of Saltz's sufficiency arguments, we similarly reject his manifest weight arguments. Since Saltz did not put forth evidence on his behalf at trial, almost all of his arguments on appeal attack the credibility of the evidence presented by the State. Saltz argues that no one, other than K.S., witnessed the acts that gave rise to the allegations. He also attempts to discredit

-20-

Leann's testimony because she has a bias against him given their poor relationship. Finally, Saltz attacks Detective Tuttle's testimony regarding his demeanor at the interview because that is normal behavior for an innocent person learning of serious allegations against him.

{¶46} "On the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Thus, it appears the jurors found the State's witnesses to be credible. *See State v. Brown*, 3d Dist. Hardin No. 6-12-01, 2012-Ohio-3904, ¶ 15, citing *DeHass* at 231 ("To begin with, a reviewing court must allow the trier of fact appropriate discretion on the credibility of witnesses."); *State v. Hoseclaw*, 3d Dist. Allen No. 1-12-31, 2013-Ohio-3486, ¶ 24 (jury was free to believe the victim's testimony regarding why she did not report the rape until nine months after it happened).

{¶47} Saltz also argues that the verdict was against the manifest weight of the evidence because the State failed to produce "conclusive" DNA evidence that Saltz raped K.S. However, such corroborating physical evidence is unnecessary in a rape case. *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 53; *State v. Banks*, 71 Ohio App.3d 214, 220 (3d Dist.1991). Although physical evidence is not required, the record indicates that there was some evidence connecting Saltz and K.S. Specifically, Miller testified that she detected amylase on both the vaginal swab and underwear. And although amylase is present in vaginal fluid, it

-21-

is most highly concentrated in saliva. Additionally, Weiss testified that the DNA on the vaginal swab and underwear was a match for Saltz or a paternal relative.

**{¶48}** After a thorough review of the record, we cannot say that this is the exceptional case where the trier of fact lost its way and committed a miscarriage of justice by finding Saltz guilty of rape.

**{¶49}** Accordingly, Saltz's second assignment of error is overruled.

**{¶50}** Having found no error prejudicial to Saltz in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/hlo**